Brian A. Ertz, (ISB No. 9960)
ERTZ LAW PLLC
P.O. Box 665
Boise, ID  83701
(208) 867-0185 (Telephone)
(208) 416-6665 (Fax)
brian@ertzlaw.org

Jessica L. Blome, Pro Hac Vice pending
Susann M. Bradford, Pro Hac Vice pending
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
Ph/FAX: (510) 900-9502
jblome@greenfirelaw.com
sbradford@greenfirelaw.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## CENTRAL DIVISION

| | |
|---|---|
| FRIENDS OF THE CLEARWATER, | Case No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT** |
| JON WORD, in his official capacity as Forest Supervisor Nez Perce-Clearwater National Forest, and the U.S. FOREST SERVICE, | |
| Defendants. | |

**NATURE OF THE ACTION**

1.       Petitioner challenges the approvals by the Forest Service and Forest Supervisor (Defendants) of six new extractive logging and road building projects on the Nez Perce-Clearwater National Forest for violations of the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA), the Endangered Species Act (ESA), the Healthy Forests Restoration Act (HFRA), and the Administrative Procedure Act (APA): (i) the Clear Creek Integrated Restoration Project, (ii) the Dixie-Comstock Community Protection Project, (iii) the Green Horse Project, (iv) the Limber Elk Project, (v) the Red Siegel Project, and (vi) the Twentymile Project (collectively, "the Six Projects"). Petitioner also challenges two previously approved and litigated Forest Service projects – the Hungry Ridge Project and the End of the World Project – for unresolved violations of the NFMA and the ESA.

2.       Together, the six new projects anticipate logging more than 19,000 acres of forested habitat and watershed lands, including thousands of acres of logging and clearcuts within vital forested habitat, while building more than 80 miles of new roads and reconditioning hundreds of miles of roads that will remain open for an unknown period of years. This is in addition to the ongoing logging of more than 26,000 acres of forested habitat and associated road-building activities that were previously approved by the two ongoing projects. Together, these projects will disrupt and degrade wildlife habitat, including old growth forests that will not return for at least a century, and undermine habitat security necessary for the recovery of the threatened Grizzly Bear.

3.       Defendants violated the NEPA and the NFMA by failing to conduct a legally sufficient analysis to determine the extent to which each project will affect old growth and thus failed to support their conclusion that the projects are consistent with the old growth

requirements of the 1987 Nez Perce Forest Plan – which is the plan under which the projects were approved. Defendants' analyses of old growth failed to consider best available science, failed to include an adequate analyses of the projects' cumulative effects on forest-wide old growth levels, and failed to show that the projects are consistent with the conservation of viable populations of old-growth-dependent species.

4.      Defendants further violated the NEPA by failing to conduct a legally sufficient analysis to support the finding that the projects individually and collectively will have "no effect" on the threatened grizzly bears. The Grizzly Bear (*Ursus arctos horribilis*) is threatened within the lower-48 states and the U.S. Fish and Wildlife Service (FWS) has determined that the recovery of grizzly bears in the Bitterroot Ecosystem is necessary to conserve grizzly bears at current levels and secure their long-term recovery. Yet, Defendants failed to evaluate the extent to which these projects will impact grizzly bear habitat, habitat security, grizzly bear habitat connectivity, or interfere with the FWS goal of grizzly bear recovery. Moreover, none of the projects' NEPA documents provide an analysis of cumulative effects of these projects on grizzly bear habitat and recovery, although the projects plainly encircle and overlap areas where FWS has determined, based on documented sightings, that grizzly bears "may be present," as illustrated in Figure 1, below.

5.      In addition, Defendants violated Section 7 of the ESA, by failing to consult with FWS based on arbitrary and capricious findings that the projects will have "no effect" on grizzly bears. Defendants' "no effect" determinations did not consider foreseeable impacts of project activities, including the potential for grizzly bear recovery to be adversely impacted by the disturbance or elimination of suitable habitat, increased road density and human activity, reduced habitat security, impacts to grizzly bear habitat connectivity corridors, or cumulative impacts of

3



Figure 1. Project areas relative to grizzly bear recovery map.[1]

---

[1] Map Data Credits: USFS, USFWS, USGS, NOAA; J. Fortin-Noreus (USFWS), Grizzly bear may be present map (updated 5/23/2024), retrieved on July 12, 2025 from https://www.fws.gov/sites/default/files/documents/2024-06/20240523_gb-species-list-area_website.pdf .

multiple projects affecting the very areas where grizzly bears have recently been observed. Defendants have also failed to review their "no effect" findings after FWS issued and updated Species Status Assessment (SSA) in 2024, finding recovery within the Bitterroot Ecosystem is necessary to sustain current levels of grizzly bear conservation and to secure grizzly bear recovery in the lower 48 states. Consultation is necessary to evaluate reasonable and prudent measures to prevent or reduce the likelihood that the projects, individually and cumulatively, may adversely affect grizzly bears by deterring their recovery in the Bitterroot Ecosystem, which has languished for 25 years since FWS approved its current recovery plan in 2000.

6.      Based on these and other violations of law, Plaintiff Friends of the Clearwater requests that the Court hold unlawful and vacate the Forest Service's approvals of the projects and enter other relief as prayed for below.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including NEPA, 42 U.S.C. §§ 4321 *et seq.*; NFMA, 16 U.S.C. §§ 1600 *et seq.*; ESA, 16 U.S.C. §§ 1531 *et seq.*; the APA, 5 U.S.C. §§ 701 *et seq.*; the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; and the Equal Access to Justice Act, 28 U.S.C. §§ 2212, 2214.

8.      This Court has the authority to review the Forest Service's action(s) and/or inaction(s) complained of herein and grant the relief requested under 5 U.S.C. § 706 and 16 U.S.C. § 1540(g).

9.      The relief sought is authorized by 28 U.S.C. §§ 2201, 2202, 16 U.S.C. § 1540, and 5 U.S.C. §§ 701-706.

10.      Venue is proper in this Court under 28 U.S.C. § 1391(e) and 16 U.S.C.

§ 1540(g)(3)(A). Violations of the ESA have occurred and continue to occur in this district, a

substantial part of events or omissions giving rise to the claim have occurred in this district,

Plaintiff has members in this district, and Plaintiff FRIENDS OF THE CLEARWATER is

headquartered in this district.

11.     The Central Division is a proper divisional venue per District of Idaho, Local

Rule Civ. 3.1.

12.     As required by the ESA, 16 U.S.C. § 1540(g)(2), Plaintiff provided notices of its

intent to bring the ESA claims in this action to the Forest Service and Secretary of the

Department of Interior more than 60 days prior to bringing this action.

## PARTIES

### A.     Plaintiff

13.     Plaintiff FRIENDS OF THE CLEARWATER is a nonprofit organization,

registered with the Idaho Secretary of State, based in Moscow, Idaho.

14.     Friends of the Clearwater is a grassroots advocacy group that works to protect the

public wildlands, wildlife, and waters of north-central Idaho, including the Nez Perce-Clearwater

National Forests. Since 1987, Friends of the Clearwater has worked to protect biodiversity and

wildlands throughout the central Idaho bioregion through a Forest Watch program, through

grassroots public involvement, outreach, education, and, when necessary, litigation. *See* Decl. of

Gary Macfarlane, ¶4; Decl. of Jeff Juel, ¶5.

15.     Friends of the Clearwater is also dedicated to ensuring the long-term survival and

recovery of the grizzly bear to its former range throughout the contiguous United States, and

specifically in the Clearwater and Salmon River Basins of central Idaho, and to ensuring that the

Service complies with all applicable federal laws related to the survival and health of this

species. In furtherance of these interests, Plaintiffs' members, supporters, and staff have worked,

and continue to work, to conserve grizzly bears throughout the contiguous United States and specifically in central Idaho. *See* Macfarlane Decl., ¶¶4, 15; Juel Decl., ¶¶5-6, 9-10, 25-26, 40-42.

16.    Friends of the Clearwater, and its board, staff, members, and supporters regularly visit, use, and enjoy the public lands and waters in the Nez Perce-Clearwater National Forests, including areas affected by the projects here at issue, for recreation, conservation, scientific, aesthetic, and other uses, and they will continue to do so in the future. Friends of the Clearwater board, staff, members, and supporters observe, enjoy, and appreciate native fish and wildlife, mature and old growth forests, and clean and healthy rivers and streams of central Idaho. These uses will be harmed or even eliminated by the logging and road building activities authorized by the Six Projects and the End of the World and Hungry Ridge projects. *See* Macfarlane Decl., ¶¶16-21, 23-24, 26, 28; Juel Decl., ¶¶5-6, 27-40, 44-45.

17.    The interests of Plaintiff and its members, supporters, and staff have been, and will continue to be, injured by the Forest Service's approval of projects that threaten the preservation of old growth forests, healthy rivers and intact ecosystems, native wildlife and wildlife habitat, and the recovery of threatened and endangered native species. *See* Macfarlane Decl., ¶¶20-22, 24-28; Juel Decl., ¶¶33-34, 39, 42-45.

18.    Moreover, the Forest Service's violations of law injure Friends of the Clearwater and its board, staff, members, and supporters by denying them the ability to adequately participate in the public review processes for the Dixie-Comstock Community Protection Project, and the Green Horse, Limber Elk, Red Siegel, and Twentymile Projects by denying them information concerning potential environmental impacts and other issues that NEPA requires agencies to disclose, analyze, and seek public review of prior to authorizing the projects. *See*

7

Macfarlane Decl., ¶¶27,29; Juel Decl., ¶¶20, 47.

**B.    Defendants**

19.    Defendant U.S. FOREST SERVICE is an agency or instrumentality of the United States within the U.S. Department of Agriculture. The Forest Service is vested with the authority and duty to manage and protect the public lands and resources of the Nez Perce-Clearwater National Forests.

20.    Defendant JON WORD is the Forest Supervisor of the Nez Perce-Clearwater National Forests. Mr. Word is the federal official responsible for authorizing actions and inactions by the Nez Perce-Clearwater National Forests, including the approval of logging and road building projects. Mr. Word is responsible for the decision to proceed with implementation the projects challenged by this action after receiving notice of the violations of law alleged herein. Mr. Word is sued solely in his official capacity.

**STATUTORY AND REGULATORY BACKGROUND**

**A.    NEPA**

21.    NEPA requires federal agencies to take a "hard look" at the environmental consequences before carrying out federal actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373–74 (1989). NEPA serves the dual purpose of, first, informing agency decisionmakers of the significant environmental effects of proposed major federal actions and, second, ensuring that relevant information is made available to the public so that it "may also play a role in both the decision-making process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

22.    "NEPA is primarily a procedural statute. Therefore, agency action taken without observance of the procedure required by law will be set aside." *Save the Yaak Comm. v. Block*,

840 F.2d 714, 717 (9th Cir. 1988) (internal citations omitted).

23.     NEPA requires federal agencies to analyze the "reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332; *Kern v. United States BLM*, 284 F.3d 1062, 1077 (9th Cir. 2002).

24.     An agency can analyze effects in three ways: (1) it can prepare an Environmental Impact Statement (EIS); (2) it can prepare an Environmental Assessment (EA); or (3) it can invoke a Categorical Exclusion (CE) to avoid preparing an EIS or EA. 42 U.S.C. 4336(b).

25.     An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(1)(C).

26.     An agency may prepare an EA in lieu of an EIS only where its analysis demonstrates the proposed action's environmental impact is not significant enough to warrant preparation of an EIS. *See Foundation for North American Wild Sheep v. United States Department of Agriculture*, 681 F.2d 1172, 1178 (9th Cir. 1982).

27.     An agency's decision not to prepare an EIS will be considered unreasonable if the agency fails to "supply a convincing statement of reasons why potential effects are insignificant." *The Steamboaters v. FERC*, 759 F.2d 1382, 1393 (9th Cir. 1985). Indeed, "the statement of reasons is crucial" to determining whether the agency took a "hard look" at the potential environmental impact of a project. *Id.*; *see also Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986) (courts will defer to an agency decision only when the agency decision is "fully formed and well-considered"); *Found. for N. Am. Wild Sheep v. United States Dep't of Agric.*, 681 F.2d 1172, 1179 (9th Cir. 1982) ("the very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for [] speculation by insuring that available data is gathered and analyzed prior to the implementation

of the proposed action").

28.    The standard for when an impact "may" be significant, and thus the agency must prepare an EIS, is a "low standard." *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

29.    An agency may avoid preparing an EIS or EA if it determines that a proposed project fits within a specified categorical exclusion. 42 U.S.C. § 4336(b)(2); 36 C.F.R. § 220.6(a). A CE applies to categories of activities that a federal agency has found "do not have a significant individual or cumulative effect on the human environment." 7 C.F.R. 1b.3; *see also* 36 C.F.R. § 220.6(a), (d)-(e).

30.    In determining whether an agency took the requisite "hard look" at the potential environmental impact of a project, Courts will consider the agency's response to public comments. *See Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1037 (9th Cir. 2012).

31.    Under NEPA, agencies must adequately address contrary scientific information. *See WildEarth Guardians v. United States Dep't of Agric. Animal & Plant Health Insp. Serv. Wildlife Servs.*, 135 F.4th 717, 736-37 (9th Cir. 2025). Where an agency does not reasonably consider and address all material aspects of the scientific debate before it, NEPA is violated. *See id*. at 737-39.

32.    NEPA requires that an agency's reliance on data not be stale. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd*., 668 F.3d 1067, 1086 (9th Cir. 2011); *Lands Council v. Forester of Region One of the United States Forest Serv.*, 395 F.3d 1019, 1030-31 (9th Cir. 2004).

33.    In analyzing environmental impacts under NEPA, an agency must provide quantified or detailed information on cumulative, connected, and similar actions. *See San Luis &*

*Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 649-50 (9th Cir. 2014); *Te-Moak Tribe of W. Shoshone of Nev. v. United States DOI*, 608 F.3d 592, 602-03 (9th Cir. 2010); *Lands Council*, 395 F.3d at 1028; *Kern v. United States BLM*, 284 F.3d 1062, 1075-76 (9th Cir. 2002); *Blue Mts. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998); *Save the Yaak Comm.*, 840 F.2d at 721; *see also* 36 C.F.R. 220.4 (f).[2]

**B.     NFMA**

34.     NFMA governs the management of national forests. *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 897-98 (9th Cir. 2002). Unlike NEPA, which is purely procedural, NFMA also imposes substantive constraints on management of forest lands. *See id.*

35.     NFMA requires the Forest Service to prepare a land and resource management plan (commonly called a "forest plan") for each national forest, including standards and guidelines for managing the forest. 16 U.S.C. §§ 1604(a), (e) & (g)(3)(B). Among other requirements, NFMA imposes the duty that the Forest Service "provide for diversity of plant and animal communities" in its forest plans. 16 U.S.C. § 1604(g)(3)(B).

36.     NFMA and its implementing regulations also require that all management actions approved by the Forest Service must be consistent with the governing forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e); *See Neighbors of Cuddy Mountain v. United States Forest Serv.*, 137 F.3d 1372, 1376-77 (9th Cir. 1998). "It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council*

---

[2] On July 3, 2025, the U.S. Department of Agriculture announced updates to the Forest Service NEPA regulations and proposed interim rules stating that the "revised agency procedures will have no effect on ongoing NEPA reviews, where USDA, following CEQ guidance, has held it will continue to apply existing applications." National Environmental Policy Act, Interim Final Rule, 90 Fed. Reg. 29632, 29634.

*v. United States Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005).

37.    The NFMA provides that where a forest plan allows timber cutting to regenerate an even-aged stand of timber, "the plan must include standards limiting the maximum size for openings that may be cut in one harvest operation, according to geographic areas, forest types, or other suitable classifications." *See* 36 C.F.R. § 219.11(d)(4). Typically, this limit may not exceed 40 acres for openings. *See id.; see also* 16 U.S.C. § 1604(g)(3)(F)(iv).

38.    However, "[p]lan standards" *may* allow for openings larger than 40 acres "where the responsible official determines that larger harvest openings are necessary to help achieve desired ecological conditions in the plan area." 36 C.F.R. § 219.11(d)(4)(i). "If so, standards for exceptions shall include the particular conditions under which the larger size is permitted and must set a maximum size permitted under those conditions." *Id.*

39.    "Plan components" may allow for openings larger than 40 acres "on an individual timber sale basis after 60 days public notice and review by the regional forester." 36 C.F.R. § 219.11(d)(4)(ii).

40.    The 40-acre limit for openings may be exceeded only where the agency provides 60 days public notice and review by the regional forester. 36 C.F.R. § 219.11(d)(4)(ii). Further, the agency must determine that "larger harvest openings are necessary to help achieve desired ecological conditions in the plan area," and "[i]f so, standards for exceptions shall include the particular conditions under which the larger size is permitted and must set a maximum size permitted under those conditions." *Id*. at § 219.11(d)(4)(i).

41.    Pursuant to NFMA, the Forest Service also designates "sensitive species," which it manages to: (1) ensure Forest Service actions do not contribute to loss of viability; (2) ensure activities do not cause the status of any species to move toward federal ESA listing; and (3)

incorporates concerns for sensitive species throughout the planning process, reducing negative effects to species, and enhancing opportunities for mitigation. Forest Service Manual, 2670.

42.     The Forest Service also designates "management indicator species" (MIS) in its Forest Plans to monitor and evaluate the effects of the agency's actions. The 1987 Forest Plan designated MIS species which: (a) are threatened or endangered; (b) have special habitat needs that may be influenced significantly by agency actions; (c) are commonly hunted, fished, or trapped; (d) are non-game species of special interest; or (e) their population changes are believed to indicate the effects of agency actions on other species of selected major biological communities or on water quality. Nez Perce Forest Plan, p. II-18.

43.     Amendments to a Forest Plan must comply with the NFMA and NEPA. *See Native Ecosystems Council,* 418 F.3d at 961; 36 C.F.R. § 219.13(b).

44.     To enact a site-specific amendment (rather than amend a forest plan as a whole), the Forest Service must "articulate a rational connection between the characteristics of the project area and the choice to adopt site-specific, rather than forest-wide, amendments." *League of Wilderness Defs./Blue Mts. Biodiversity Project v. Connaughton*, No. 3:12-cv-02271-HZ, 2014 U.S. Dist. LEXIS 170072, at *74-75 (D. Or. Dec. 9, 2014). However, forest plan amendments that result in a significant change require the Forest Service to prepare an EIS and analyze the amendment through the same procedure used to analyze the Forest Plan. *See* 16 U.S.C. § 1604(f)(4); 36 C.F.R. 219.13(b)(3); *All. for the Wild Rockies v. Marten*, 585 F. Supp. 3d 1252, 1273 (D. Mont. 2021).

45.     "Simply explaining the purpose of the Project, the desired conditions for the Forest, or stating that the amendment is site-specific because it was designed for a specific site, does not satisfy the rational connection between the facts found and the choice made." *League of*

*Wilderness Defs./Blue Mts. Biodiversity Project*, 2014 U.S. Dist. LEXIS at *83. The agency must

show "at least some characteristics unique to a site to support a site-specific amendment." *Id.* at

*82 (citing *Lands Council v. Martin*, 529 F.3d 1219, 1228 (9th Cir. 2008)).

46.     Upon the issuance of a new or revised Forest Plan, unless the new plan expressly

states that an authorized use may proceed unchanged, the Forest Service must act to resolve any

inconsistencies and make every project and activity consistent with the new plan. 36 C.F.R.

§ 219.15.

**C.     Healthy Forests Restoration Act**

47.     In 2014, Congress amended the HFRA to include 16 U.S.C. §§ 6591a and 6591b.

Congress did so in response to "[t]he outbreak of the pine bark beetle" and the subsequent

"creat[ion of] potentially hazardous fuel loads in several western states." *See* 160 Cong. Rec.

H1408 (daily ed. Jan. 27, 2014) (conference report). Congress intended to expedite treatment of

infested and at-risk areas because "the current system for managing national forests affected by

historic insect infestations has not been responsive to the speed and widespread impact of [bark

beetle] infestations." *See id.*

48.     HFRA effectuates Congress' intent by authorizing the Secretary of Agriculture to

designate areas that are experiencing insect or disease threats that need to be addressed. 16

U.S.C. § 6591a(b). "Collaborative restoration projects" in designated areas "may be . . .

considered an action categorically excluded" from the usual NEPA process of preparing an EA

or EIS if the project meets several criteria. *Id.* at § 6591b.

49.     Collaborative restoration projects must (a) maximize the retention of old growth

and large trees, (b) consider the best available scientific information for the purpose of

maintaining or restoring ecological integrity, including maintaining or restoring structure,

function, composition, and connectivity, and (c) be developed and maintained through a

transparent and nonexclusive collaborative process. *See* 16 U.S.C. §§ 6591a(e), 6591b(b).

50.     To invoke the categorical exemption, "[a] project under this section may not exceed 3000 acres." 16 U.S.C. § 6591b(c)(1).

51.     HFRA does not eliminate the requirement for the Forest Service to comply with applicable land and resource management plans. *See* 16 U.S.C. § 6591b(d)-(e).

**D.     Endangered Species Act**

52.     The ESA, 16 U.S.C. § 1531 et seq., is the nation's preeminent wildlife protection law. Congress enacted the ESA to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The "plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).

53.     Under the ESA, the Secretary of the Interior or Commerce lists a species as "endangered" if it is "in danger of extinction throughout all or a significant portion of its range," or "threatened" if it is "likely to become an endangered species within the foreseeable future." 16 U.S.C. §§ 1533(a)(1), 1532(6) & (20).

54.     A listed "species" may include a "distinct population segment" (DPS) of a species. 16 U.S.C. § 1532(16). To be a DPS, a population of a species must be both "discrete" and biologically and ecologically "significant." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

55.     Section 7(a)(2) of the ESA requires all federal agencies to consult with the Secretary to "insure that any action authorized, funded or carried out by such agency. . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species," unless the agency has been granted an exemption. 16 U.S.C. § 1536(a)(2).

15

56.    Agency action for purposes of Section 7(a)(2) includes federal agency authorization of private activities, such as logging on National Forest land. The ESA's implementing regulations require federal agencies to review their actions at the "earliest possible time" to determine whether an action may affect listed species or their critical habitat. 50 C.F.R. § 402.14.

57.    To fulfill its Section 7(a)(2) mandate, the "action agency" must consult with the FWS and/or the National Oceanic and Atmospheric Administration (NOAA Fisheries) if it determines that a proposed action "may affect" a listed species or its critical habitat. 16 U.S.C. § 1536; 50 C.F.R. § 402.14(a). The Ninth Circuit holds that "the minimum threshold for an agency action to trigger consultation with the Wildlife Service is low." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011).

58.    FWS is responsible for consultation for terrestrial and freshwater aquatic species, such as grizzly bear, wolverine, and bull trout. *See* 50 C.F.R. § 402.01. *Id.* NOAA Fisheries (also known as the National Marine Fisheries Service) is responsible for consultations for anadromous fish species, such as Snake River steelhead and Chinook salmon. Consultation enables the FWS and /or NOAA to evaluate the potential for an agency action to harm protected species and to identify "reasonable and prudent measures" that are "necessary or appropriate to minimize such impact." 16 U.S.C. § 1536 (b)(3)-(4).

59.    To comply with the ESA Section 7 consultation process, an action agency, like the Forest Service here, must prepare a biological assessment (BA) to evaluate the potential effects of a proposed action on listed species, and determine whether a species is "likely to be adversely affected" (LAA) or "not likely to be adversely affected" (NLAA) by the proposed action. 50 C.F.R. § 402.12.

16

60.    In addition, if an action agency determines that no part of the proposal would have any foreseeable effect on the listed species, it may issue a finding that the proposed action has "no effect" on a listed species; for example, where a species has no exposure to the project area. Importantly, a finding of "no effect" is not the same as an insignificant or discountable effect. "Any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgt.*, 698 F.3d 1101, 1122 (9th Cir. 2012).

61.    For LAA actions, the action agency must seek "formal" consultation with FWS and/or NOAA Fisheries. 50 C.F.R. § 402.14(a). For NLAA actions, the action agency may seek "informal" consultation with FWS and/or NOAA Fisheries. 50 C.F.R. § 402.14(b). If it is clear that an action will have "no effect" on a species, no further consultation is required.

62.    During ESA consultation, the consulting agency must review all relevant information, evaluate the current status of the species or critical habitat, and evaluates the effects of the proposed action on the listed species and its critical habitat. 50 C.F.R. § 402.14(g)(1)-(3). Throughout its analysis, the consulting agency must utilize the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §402.14(d).

63.    Informal consultation concludes with a Letter of Concurrence from the consulting agency. 50 C.F.R. § 402.14(b). A letter of concurrence is only appropriate when the BA or other information demonstrates that the action has no likelihood of adverse effect to the listed species. *Id.*; *see also* U.S. Fish and Wildlife Service & National Marine Fisheries Service, Endangered Species Consultation Handbook (1998), pp. 3–12.

64.    Formal consultation results in a Biological Opinion (BiOp) from the consulting agency. BiOps include binding reasonable and prudent measures, as well as binding terms and

conditions, for the action agency to protect listed species or critical habitat. 16 U.S.C. §

1536(b)(4). If the consulting agency makes a jeopardy determination, the BiOp may specify

reasonable and prudent alternatives that will avoid jeopardy and will allow the agency to proceed

with the action. 16 U.S.C. § 1536(b).

65.     After the completion of formal consultation, the action agency must determine

whether and in what manner to proceed with the action in light of its Section 7 obligations and

the BiOp. 50 C.F.R. § 402.15(a).

66.     Consultation enables the FWS to evaluate the potential for an agency action to

harm protected species and to identify "reasonable and prudent measures" that are "necessary or

appropriate to minimize such impact." 16 U.S.C. § 1536 (b)(3)-(4).

67.     The ESA also includes a citizen suit provision that allows "any person . . . to

enjoin any person, including the United States and any other government instrumentality or

agency . . . alleged to be in violation of any provision of [the ESA] or regulation issued under the

authority thereof." 16 U.S.C. § 1540(g)(1)(A).

68.     ESA violations are subject to review under Section 706 of the APA. Under that

standard, a reviewing court must overturn an agency decision if it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A reviewing

court "must not 'rubber-stamp … administrative decisions that they deem inconsistent with a

statutory mandate or that frustrate the congressional policy underlying a statute.'" *Bureau of

Alcohol, Tobacco and Firearms v. Fair Lab. Rel. Auth.*, 464 U.S. 89, 97 (1983) (quoting *Nat'l

Lab. Rel. Bd. v. Brown*, 380 U.S. 278, 291–292 (1965)).

E.     **The Administrative Procedure Act**

69.     The APA grants a right of judicial review to "[a] person suffering legal wrong

because of agency action or adversely affected or aggrieved by agency action." 5 U.S.C. §702.

70.     When examining an agency's actions under the APA, a court will generally consider whether (1) the agency action is lawful; (2) the agency complied with procedural requirements; or (3) the agency adequately supported its factual findings and decisions. *See Golden IT, LLC v. United States*, No. 24-1893C, 2025 U.S. Claims LEXIS 1820, at *29-30 (Fed. Cl. July 14, 2025).

71.     Sections 706(2)(A), (C), and (D), which apply to all cases involving agency action, *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971), provide:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall …
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; …
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law …

72.     In addressing these generally applicable provisions, the reviewing court must engage in "substantial inquiry" of an agency decision. *Citizens to Pres. Overton Park, Inc.*, 401 U.S. at 415.

## FACTUAL BACKGROUND

### A.    Nez Perce Clearwater National Forests

73.     The Nez Perce-Clearwater National Forests are located in central Idaho, within the Selway-Bitterroot ecosystem of the Northern Rockies, west of the continental divide and north of the Salmon-Clearwater divide. These Forests span an area encompassing the watersheds of the Clearwater, Selway, and Lochsa rivers, and is located within one of the largest areas of contiguous forested habitat remaining within the lower-48 states.

74.     The Nez Perce-Clearwater National Forests provide vital habitat for numerous

native species, including several old-growth-dependent species and special status species. Old-growth-dependent species that rely on these forests include the American pine marten (*Martes americana*), the Northern Goshawk (*Accipiter gentilis*), and Northern Rockies fisher (*Pekania pennanti*), which dwells only in old growth forests in parts of Montana and Idaho. Mature forests also provide important habitat for the threatened Canada Lynx (*Lynx canadensis*). The preservation of mature, old growth forests is also a key indicator of forest health and ecological diversity.

75.    The Nez-Perce-Clearwater National Forests also provides important habitat for the threatened Grizzly Bear (*Ursus arctos horribilis*). Grizzly bears are native to this region but were hunted and killed to the point of local extinction by the 1940s. In recent years, bears have been documented returning to the area but, as yet, no breeding population has been established. The U.S. Fish and Wildlife Service has identified the Bitterroot Ecosystem as a key area for grizzly bear recovery, necessary to secure the recovery of the species within the lower-48 states.

76.    The Nez Perce-Clearwater National Forests contains approximately 4-million-acres of land that is managed by the Forest Service pursuant to the requirements of the NFMA and its implementing regulations.

**1987 Nez Perce Forest Plan**

77.    In 1987, the Forest Service adopted a forest plan for the Nez Perce Forest Plan (hereinafter "1987 Forest Plan"), which contains goals, objectives, guidelines, and standards for managing logging and for protecting old growth forest, water quality, fish, and wildlife on the lands of the Nez Perce National Forest.

78.    The 1987 Forest Plan was operative at the time each of the challenged logging projects were approved, and was the basis for Defendants' determinations that each project was consistent with the applicable Forest Plan, as required by the NFMA.

20

79.    The 1987 Forest Plan states: "Viable populations of old-growth-dependent species will be maintained." It also states that "[h]abitats will be maintained to provide for population viability of all sensitive species including the wolverine, big-eared bat, Harlequin duck, boreal owl, and common loon." 1987 Forest Plan, p. II-6.

80.    The 1987 Forest Plan identified the following species as "management indicator species" in the Nez Perce National Forest: bald eagle, grizzly bear, bighorn sheep, fisher, gray wolf, northern goshawk, pileated woodpecker, pine marten, elk, moose, peregrine falcon, westslope cutthroat trout, Chinook salmon, and steelhead. 1987 Forest Plan, p. VI-9.

81.    To protect wildlife, the 1987 Forest Plan directed the Forest Service to, among other things: "[m]aintain viable populations of existing native and desirable non-native vertebrate wildlife species"; "[c]ooperate with future recovery efforts on behalf of the peregrine falcon, bald eagle, gray wolf, and grizzly bear"; and "[m]onitor population levels of all Management Indicator Species on the Forest." 1987 Forest Plan, p. II-18.

82.    Additionally, the 1987 Forest Plan includes measures to protect old growth forest and the wildlife that utilize old growth. Among these measures, the Forest Plan directed the Forest Service to "[p]rovide management for minimum viable populations of old-growth- and snag-dependent species by adhering to the standards in Appendix N." 1987 Forest Plan, p. II-19.

83.    Appendix N of the 1987 Forest Plan, entitled "Old Growth and Snag Management Standards," includes "Minimum Requirements for Amount and Distribution of Old Growth." Those minimum requirements are "to maintain 10 percent of the total forested acres [across the Nez Perce National Forest] as old growth with no less than 5 percent of the forested acres maintained as old growth within each prescription watershed or combination of watersheds totaling 5,000 to 10,000 acres," and "[a]n additional 5 percent of the forested acres within each

prescription watershed shall be designated as replacement old growth." 1987 Forest Plan, Appendix N.

84.    The Forest Service created Old Growth Analysis Areas (OGAA) to serve as the prescription watersheds (or combinations of prescription watersheds) within which the minimum five percent existing old growth and minimum five percent replacement old growth requirements in Appendix N must be met.

85.    Appendix N defined old growth habitat as "a community of forest vegetation which has reached a late stage of plant succession characterized by a diverse stand structure and composition along with a significant showing of decadence."

86.    Appendix N also established standards for "Identification and Designation of Old Growth Stands." It provides that "[o]ld-growth stands will be identified through the use of stand exam information, aerial photos, and field reconnaissance." Further, "[a]ll stands will be inventoried and prioritized with highest priority for inventory in those drainages with proposed timber sales or activities that could adversely impact old growth." 1987 Forest Plan, Appendix N.

87.    Appendix N defined an "old growth stand" as a stand of timber that meets the following six criteria:

(1) At least 15 trees per acre > 21 inches diameter at breast height (DBH). Providing trees of this size in the lodgepole pine and sub-alpine fir stands may not be possible.

(2) Two or more canopy layers.

(3) At least .5 snags per acre > 21 inches DBH and at least 40 feet tall.

(4) Signs of rot and decadence present.

(5) Overstory canopy closure of 10-40 percent; understory canopy closure of at least 40 percent; total canopy closure at least 70 percent.

(6) Logs on the ground.

(1987 Forest Plan, Appendix N.)

88.    Appendix N also set goals and requirements for the size and relative location of stands and complexes of old growth and specifies how to count existing old growth versus replacement old growth within the same complex, including the following:

> Where available, stands should be at least 300 acres. Next best would be a core block of 150 acres with the remaining blocks of no less than 50 acres and no more than 1/2 mile away. If existing old growth blocks are less than 100 acres, the stands between the old-growth blocks should be designated old growth replacement. The entire unit consisting of old-growth blocks and replacement old growth should be managed as an old-growth complex. If the old-growth component is less than 50 percent of the complex, the complex should be considered replacement old growth. Within the old-growth complex, only the stands that meet old-growth criteria will be counted toward meeting the allocation for existing old growth. The replacement stands will be counted toward meeting the allocation for replacement old growth.

1987 Forest Plan, Appendix N.

89.    Importantly, the 1987 old growth standards are also characterized as the minimums amounts necessary "to maintain a viable population of old-growth-dependent species." To further this goal, Appendix N also specifies that "[t]o increase the probability of species immigration and colonization of old growth islands and to facilitate genetic interchange between isolated population demes, a system of corridors interconnecting old-growth islands is required." 1987 Forest Plan, Appendix N.

90.    Maintaining sufficient old growth forest-wide, and in connected areas, as required by Appendix N, is a means both to preserve old growth and a means to ensure that sufficient habitat is maintained to support viable populations of old-growth-dependent species.

91.    The 1987 Forest Plan contained no standards or components that allow individual projects to exceed the 40-acre forest opening limitation established pursuant to NFMA.

92.    The 1987 Forest Plan, including Appendix N, remained in effect as the operative Land Management Plan or Forest Plan for Nez Perce National Forests until the Forest issued a

new Land Management Plan (LMP) in January 2025.

93.    Pursuant to the LMP Record of Decision, "[p]reviously approved and ongoing projects and activities are not required to meet the direction of the revised plan and will remain consistent with the direction in the Nez Perce 1987 and Clearwater1987 Plans, as amended." Forest Service (Jan. 10, 2025), Final Record of Decision Revised Land Management Plan Nez Perce-Clearwater National Forests, p.86.

94.    The challenged projects were approved under the 1987 Forest Plan and were not evaluated for consistency with the 2025 LMP.

**B.    Delayed Grizzly Bear Recovery in the Bitterroot Ecosystem**

95.    The Grizzly bear population in the lower 48 states has been listed as a "threatened" species under the Endangered Species Act since 1975.

96.    In 1993, the FWS issued a grizzly bear recovery plan that identified six recovery zones, including the Bitterroot Ecosystem. FWS (1993), Grizzly Bear Recovery Plan, at 11-13.

97.    Recovery zones are defined as areas that are necessary for the recovery of the species and are to be managed with an emphasis on conserving grizzly bear habitat. *See* e.g., Forest Service (2023), NPCNF Land Use Plan FEIS, at 991-92.

98.    In 2000, the FWS issued a Final EIS for Grizzly Bear Recovery in the Bitterroot Ecosystem and authorized the reintroduction of grizzly bears to the Bitterroot. The FWS ROD and Final Rule identified a recovery zone within the larger Bitterroot ecosystem that includes portions of the Nez Perce-Clearwater National Forest. The FWS also identified a large area surrounding the Bitterroot Grizzly Bear Recovery Zone in which reintroduced grizzlies would be managed as an experimental population. *See* Figure 1, *infra*, p. 4.

99.    Now more than twenty years later, the reintroduction plan was never implemented, and grizzly bears still have not recovered.

100.     Since 2007, multiple grizzlies have been documented within Nez Perce Clearwater National Forest in areas surrounding the Bitterroot Grizzly Bear Recovery Zone. However, some of these bears were trapped and removed instead of being allowed to remain in the area. Other bears are believed to have migrated through and left again on their own. USFWS, 2024 Grizzly Bear SSA, p. 70.

101.     Despite these occurrences, the Forest Service has continued to manage the Forest as if no bears are present and dismissed recent sightings as merely transient bears that do not warrant management consideration because they are not breeding females. The Forest Service has not evaluated whether its ongoing approvals of management actions involving roads and clearcuts that disturb grizzly habitat have deterred bears from returning to den and breed in this area.

102.     In 2023, a federal court in Montana held that the FWS decision to reintroduce grizzlies to the Bitterroot was still legally binding, although the agency through its inaction had effectively defaulted to its "no action alternative" of allowing grizzly bears recovery through natural migration rather than undertaking re-introduction by releasing captured grizzlies into the area. *Alliance for the Wild Rockies v. Cooley*, 661 F. Supp. 3d 1025, 1042 (D. Mont. 2023). However, due to changed circumstances, including "the current presence of naturally occurring grizzly bears" in the Bitterroot Ecosystem, the Court ordered FWS to prepare a supplemental EIS "to ensure that grizzly bear recovery efforts are based on contemporaneous and accurate scientific data." *Id.*

103.     The 2023 court decision also noted that the FWS in 2022 acknowledged that "in the last five years, there have been verified sightings of grizzly bears in the headwaters of the east fork of the Bitterroot River; in the Miller Creek area to the south of Missoula; in the Trail

Creek area east of Lost Trail ski area; at the Stevensville Golf Course; along Lolo Cr/Hwy 12 just west of Lolo, Montana; and near the Lochsa River in Idaho southeast of Lolo Hot Springs." . . . and that FWS "has even updated its 'may be present' map for grizzly bears . . . while also reporting that 'no *known* population' exists in the Bitterroot Ecosystem." *Alliance for the Wild Rockies*, 661 F. Supp. 3d at 1041.

104.    In March 2024, the federal court for the District of Idaho restricted wolf trapping in areas where grizzly bears may be present outside of denning season, including in grizzly habitat within the Salmon and Clearwater regions – and Nez Perce Clearwater National Forests – noting that recent sighting of bears in this area "logically . . . increased risk that a grizzly bear will be taken." *Center for Biological Diversity, et al v. Brad Little, et al*; Case No. 1:21-cv-00479-CWD (D. Idaho Mar. 19, 2024), at *40.

105.    In 2024, the FWS issued an updated Species Status Assessment for Grizzly Bears (2024 Grizzly Bear SSA), which found that recovery of grizzlies within the Bitterroot ecosystem would significantly improve the resiliency of the lower-48 population as a whole, increasing ecological diversity and improving the grizzlies' ability to withstand catastrophic events and long-term environmental change. 2024 Grizzly Bear SSA, at 267-68. The SSA reflects current science, and shows that low to moderate grizzly bear recovery in the Bitterroot is necessary to maintain grizzly bear conservation at current levels and to assure the long-term viability of grizzly bear populations in the lower-48 states.

106.    In January 2025, the FWS issued a proposed rule reconfirming the threatened status of grizzly bears throughout the lower 48 states. *See* Grizzly Bear Listing, Revised Section 4(d) Rule [Proposed Rule], 90 Fed. Reg. 4234 (Jan. 15, 2025).

107.    As noted in the Forest Service's Final EIS for its 2025 LMP, "the Nez Perce-

Clearwater has the distinctive role and contribution of providing ecological conditions for grizzly bears to recolonize the Bitterroot Recovery Zone and maintain the ecological conditions to allow for migration, dispersal, and genetic interchange between grizzly bear recovery zones." NPCNF Land Management Plan FEIS, at 994.

108.    In addition, the June 2023 Biological Assessment for the Revised Nez Perce Clearwater Forest Plan found that "the Revised Forest Plan under the Proposed Action May affect and is Likely to Adversely Affect grizzly bears that may currently be present or that may disperse into the plan area in the future." NPCNF, Biological Assessment for Threatened, Endangered, Proposed Species, and Essential Fish Habitat Assessment (June 2023), p. 381.

**C.    The Six Challenged Logging and Road Building Projects Projects**

109.    The Six Projects challenged in this action -- Clear Creek Integrated Restoration Project, (ii) the Dixie-Comstock Community Protection Project, (iii) the Green Horse Project, (iv) the Limber Elk Project, (v) the Red Siegel Project, and (vi) the Twentymile Project – are summarized, in pertinent part, below.

110.    As shown in Figure 2, the Six Projects are located near the Bitterroot Grizzly Bear Recovery Zone and within or near areas where grizzly bears "may be present." The Six Projects are also located near the End of the World and Hungry Ridge Projects. All of these projects are within the range of the contiguous U.S. grizzly bear distinct population segment identified by USFWS in its 2024 Grizzly Bear SSA and January 2025 Revised Grizzly Bear listing. *See* Grizzly Bear Listing, Revised Section 4(d) Rule [Proposed Rule], 90 Fed. Reg. 4234 (Jan. 15, 2025).

**Clear Creek Integrated Restoration Project**

111.    The Clear Creek Integrated Restoration (CCIR) Project area includes 43,731 acres of National Forest System (NFS) lands.

27



Fig. 2. Grizzly Bear habitat in relation to Project Areas.[3]

112.    In February 2015, the Forest Service issued a final EIS for the Clear Creek

---

[3] Map Data Credits: USFS; USFWS; USGS; NOAA; Grizzly Bear may be present map updated May 23, 2024, Jennifer Fortin-Noreus/USFWS, Public Domain; www.fws.gov/media/grizzly-bear-may-be-present-map (2022); Grizzly Bear Denning Habitat (Bader % Sieracki, 2022).

Integrated Restoration Project (CCIR) with draft Record of Decision. Following public comment, the Forest Service updated and republished the final EIS in September 2015, with a final Record of Decision issued in December 2015. After this Project was challenged by a complaint filed on July 2, 2016, in the United States District Court for the District of Idaho, the ROD was withdrawn in August 2016.

113.    As adopted in 2023, the CCIR Project authorizes over 8,000 acres for precommercial thinning, commercial thinning, regeneration harvest and reforestation, improvement harvest, and intermediate harvest. Temporary road construction also is authorized to implement these timber activities.

114.    As adopted in 2023, the CCIR Project authorizes over 8,000 acres for precommercial thinning, commercial thinning, regeneration harvest and reforestation, improvement harvest, and intermediate harvest. Temporary road construction also is authorized to implement these timber activities.

115.    The Project will result in 12 forest openings greater than 40 acres (ranging from 47 to 152 acres). CCIR ROD, p. 43. In so doing, the agency violated NFMA because the 1987 Forest Plan contains no standards or components that allow the 40-acre limit to be exceeded – a necessary requirement of NFMA. *See Native Ecosystems Council v. United States Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005); 36 C.F.R. § 219.11(d); 16 U.S.C. § 1604(g)(3)(F)(iv).

116.    The stated purpose of the Clear Creek Integrated Restoration Project is "to manage forest vegetation to restore natural disturbance patterns; improve long-term resistance and resilience at the landscape level; reduce fuels; improve watershed conditions; improve elk habitat effectiveness; improve habitat for early seral species; and maintain habitat structure, function, and diversity." CCIR Final Suppl. EIS (2023), p. i. Like other timber sale projects,

"[t]imber outputs from the proposed action would be used to offset treatment costs, support the economic structure of local communities, and provide for regional and national needs." *Id*. The Forest Service did not disclose any standards by which exceedances are allowed nor set the maximum size permitted.

117.    The CCIR Project adopts a "nonsignificant" site-specific amendment to replace the 1987 Forest Plan's Appendix N definitions of old growth with the definitions found in Old Growth Forest Types of the Northern Region (Green et al. 1992, errata corrected 12/11). In justifying this amendment, the Forest Service stated the old growth definitions in Green et al. are considered the "best available science" for classification of old growth at the site-specific level in the Northern Region. The Forest Service noted that the amendment does not change the amounts of old growth required by Appendix N, but only affects the screening criteria.

118.    The site-specific amendment does not comply with NFMA and NEPA as the Forest Service's justification for the amendment does not identify any characteristic unique to the CCIR Project area that warrants a site-specific (rather than a forest-wide) amendment. *League of Wilderness Defs./Blue Mts. Biodiversity Project*, 2014 U.S. Dist. LEXIS 170072, at *74-75.

119.    The Forest Service's justification for the amendment was arbitrary and capricious as evidenced by the fact that the other timber sales at issue in this Complaint do not rely upon Green et al. criteria but instead apply the criteria in Appendix N of the 1987 Forest Plan.

120.    Reliance on Green et al. criteria, as contemplated by the site-specific amendment, does not otherwise tier to the 1987 Forest Plan in violation of NFMA. In previous litigation involving logging projects in the Nez Perce-Clearwater National Forests, the United States District Court for the State of Idaho found that applicable criteria (North Idaho Old Growth or

NIOG) in Old Growth Forest Types of the Northern Region consider a broader category of trees as old growth than applicable criteria in the 1987 Forest Plan. *See* Memorandum Decision and Order in *Friends of the Clearwater v. Cheryl F. Probert, et al.*, Case No. 3:21-cv-189-CWD, 2022 U.S. Dist. LEXIS 113538 (D. Idaho June 24, 2022) (finding that "the Forest Plan cannot reasonably be read to include NIOG as meeting the criteria for an old growth stand").

121.    In its NEPA review of impacts to old growth, the Forest Service concluded that the Project would not impact the 1987 Forest Plan's requirement of at least 10% of forest-wide acres being maintained as old growth. And, the Forest Service also concluded that the Project would not log any "verified" old growth stands according to the standards in Appendix N of the Forest Plan as modified by the site-specific Forest Plan Amendment. Improvement cuts in old growth stands are authorized, however.

122.    The Forest Service's conclusions regarding forest-wide and site-specific old growth are based on stale data collected from 2007 through 2012. This lack of up-to-date evidence on the relevant question of old growth impacts prevented the Forest Service from fulfilling NEPA's "hard look" requirement.

123.    In addressing old growth impacts, the Forest Service improperly relied upon Forest Inventory and Analysis (FIA) data. This data was not designed to inventory old growth and does not constitute the best available science for assessing old growth. The plot locations also have not been shared with the public or local forest managers, which violates the Forest Plan and prevents independent verification.  According to the 1987 Forest Plan, old growth is to be designated pursuant to data collected from stand exam information, aerial photos, and field reconnaissance. As regards forest-wide analysis, the stale data was not based on aerial surveillance. As regards site-specific analysis, the agency acknowledges "[a]dditional old-growth

forest is present in each of the [Project area's] OGAAs but has not been verified by recent stand exams." Despite this, the Project authorizes logging in units with "unverified" old growth.

124.    The Forest Service's conclusions regarding impacts to old growth also failed to reasonably consider and address impacts, including tree-removal, caused by temporary road construction.

125.    The Forest Service's project analysis also failed to adequately evaluate the project's impacts on old-growth-dependent species, which also relied on FIA data to conclude that forest-wide old growth is adequate to maintain viable populations of MIS species. The final EIS indicates the project will affect more than 7000 acres of fisher habitat and acknowledges that openings over 40 acres can have significant adverse impacts on fisher and marten. CCIR Final EIS, p. 50, 152-53.

126.    The NEPA analysis for Clear Creek included a Biological Assessment for Grizzly Bear that was issued in 2021. This document acknowledges that the project is located in an area adjacent to sub-watersheds where grizzly bears "may be present," as determined by FWS from documented sightings. However, the Forest Service nevertheless issued a determination that the project would have "no effect" on grizzly bears.

127.    The Clear Creek grizzly bear BA did not evaluate whether the project would impact or eliminate suitable grizzly bear habitat or assess the potential impacts of the proposed action on road density, habitat security, habitat connectivity, or successful grizzly bear recovery.

128.    The Forest Service's analysis of impacts to old growth, old-growth-dependent species, and grizzly bears also violates NEPA because it failed to provide an adequate discussion of cumulative effects caused by several related projects that were not identified or identified but not quantitatively evaluated. The Forest Service's impact analyses also failed to examine

combined effects of multiple ongoing projects affecting the same wildlife populations and old growth metrics.

129.    In addressing comments that opposed the Forest Service's reliance on Green et al. criteria and addressed the agency's failure to take a hard look at environmental consequences (including impacts to grizzly bears), the Forest Service did not respond with a reasoned explanation of its analysis nor justify its scientific methodology.

**Dixie-Comstock Community Protection Project**

130.    On May 18, 2023, the Forest Service received approval pursuant to 36 C.F.R. § 218 for an emergency situation determination for the Dixie Comstock Community Protection Project (Dixie-Comstock Project); therefore, the Project was not subject to the predecisional objection process.  Instead, the combined scoping and EA comment period commenced on February 6, 2024, when the Forest Service published a draft Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) for the Dixie-Comstock Project.

131.    Alternative B from the EA was adopted through a Decision Notice that was signed on June 14, 2024.

132.    The Dixie-Comstock Project encompasses a 37,343-acre project area. The adopted alternative authorizes landscape prescribed burning, roadside shaded fuel breaks, and hand/mechanical thinning of approximately 4,900 acres. Temporary road construction also is authorized to implement these timber activities.

133.    The Project will create 14 forest openings greater than 40 acres (ranging from 41 to 790 acres), totaling 2904 acres. As NFMA generally limits openings to 40 acres, the agency issued a 60-day public notice and obtained approval to exceed the limit. In so doing, the agency violated NFMA because the 1987 Forest Plan contains no standards or components that allow the 40-acre limit to be exceeded – a necessary requirement before any project can exceed 40 acres.

134.     Some small stands of old growth can be found scattered throughout the Project area. For these stands, the Project authorizes removal for fuel reduction activities.

135.     The EA states that the Dixie-Comstock Project tiers to the 1987 Forest Plan; however, because the Project cannot meet the Forest Plan's requirements in Appendix N, Section A1, the Forest Service adopted a site-specific amendment to suspend Section A1's requirements for the Project. Section A1 states that "it is necessary to maintain 10 percent of the total forested acres as old growth with no less than 5 percent of the forested acres maintained as old growth within each prescription watershed or combination of watersheds totaling 5,000 to 10,000 acres. If less than 5 percent old growth exists in a drainage, the additional required acres will be assigned to adjacent drainages where excess old growth is available."  The Forest Service wrote that the amendment was necessary because "there is not enough remaining old growth due to recent fire history" to meet Section A1's requirements." EA/FONSI, p. 4.

136.     The amendment violates NFMA and NEPA because (1) it eliminates consideration of the 10% forest-wide old growth requirement, which is not "site-specific," and (2) the agency failed to explain why recent fire history necessitates the removal of the 1987 Forest Plan's requirement for replacement acres when less than 5% old growth exists.

137.     In addressing old growth impacts, the Forest Service relied on stale data and did not adhere to the 1987 Forest Plan's requirements regarding inventorying through the use of stand exam information, aerial photos, and field reconnaissance. The agency also failed to identify necessary data and information.

138.     In addressing old growth impacts, the Forest Service improperly relied upon FIA data. This data was not designed to inventory old growth and does not constitute the best available science for assessing old growth. The plot locations also have not been shared with the

34

public or local forest managers,  which violates the Forest Plan and prevents independent verification.

139.    The Forest Service's review and analysis for Dixie-Comstock included a Wildlife Report and Risk Evaluation (Wildlife Report) issued in February 2024. The Wildlife Report states that it is the biological evaluation for grizzly bear for the project, as require by the ESA. Wildlife Report, p. 22.

140.    The Wildlife Report acknowledges that grizzly bear activity has been documented in nearby areas where grizzly bears "may be present," but nevertheless issued a determination that the project would have "no effect" on grizzly bears.

141.    The Wildlife Report did not consider potential impacts on grizzly bear recovery due to the Dixie-Comstock Project's location adjacent to the Bitterroot Grizzly Bear Recovery Area. Wildlife Report, pp. 22-26. The Wildlife Report also did not evaluate the extent to which the project would impact or eliminate suitable grizzly bear habitat, or assess the potential impacts of the proposed action on road density, habitat security, habitat connectivity, or successful grizzly bear recovery. *Id*.

142.    The Wildlife Report also acknowledged that the project does not meet habitat recommendations for fisher, an MIS and old-growth-dependent species, because 30 percent of the project is within fisher habitat, and notes that the project will "reduce the amount of mature forest by 513 acres," which "equates to a 4 percent decrease of mature habitat within modeled fisher habitat within the project area." Wildlife Report, p. 61. The Wildlife Report nevertheless concluded that the project will not affect species viability at the population level. *Id*. at 62.

143.    The Wildlife Report also failed to provide an adequate analysis of the cumulative effects on grizzly bear and fisher, or other old-growth-dependent species, caused by several

additional ongoing and planned projects that were not identified or quantitatively evaluated. The Forest Service's impact analyses also failed to examine combined effects of multiple ongoing projects affecting the same wildlife populations and the same forest-wide old growth requirements.

144.    The EA/FONSI briefly notes that present and reasonably foreseeable activities expected to occur within or adjacent to the Project area include timber harvests and fuel reduction activities; however, the EA/FONSI contains no substantive analysis of potential cumulative effects nor is substantive data identified.

145.    In adopting the Dixie Comstock Project, the Forest Service did not provide any reasoned explanation or scientific support in response to opposing views raised by the public, but instead, the agency relied on unexplained conclusions to justify its adoption of the Project.

**Green Horse Project**

146.    The Forest Service used an EA to analyze the Green Horse Project, and in March 2023, the agency adopted the Project with the issuance of a Decision Notice.

147.    The Green Horse Project area encompasses approximately 9,500 acres. Approximately 2,000 acres will be subjected to prescribed burning and harvesting. Over 40 miles of road construction and reconditioning also is authorized.

148.    The Project will result in eight forest openings greater than 40 acres (ranging from 45 to 406 acres). In so doing, the agency violated NFMA because the 1987 Forest Plan contains no standards or components that allow the 40-acre limit to be exceeded – a necessary requirement before any project can exceed 40 acres. *See Native Ecosystems Council*, 418 F.3d at 961; 36 C.F.R. § 219.11(d); 16 U.S.C. § 1604(g)(3)(F)(iv).

149.    The Project area contains six Old Growth Analysis Areas (OGAAs). The Forest

Service states four out of the six are meeting Forest Plan requirements for 5% old growth and 5% replacement within each OGAA; however, the agency did not identify the source or date of data it relies upon for this statement. As regards the two OGAAs that do not meet the 5% requirements, the Forest Service did not comply with the 1987 Forest Plan, and the Project contains no mitigation measures.

150.    In addressing old growth impacts, the Forest Service improperly relied upon FIA data. This data was not designed to inventory old growth and does not constitute the best available science for assessing old growth. The plot locations also have not been shared with the public or local forest managers, which violates the Forest Plan and prevents independent verification.  The Green Horse Project EA states that the project will reduce late seral species across a 1500-acre treatment area. Green Horse EA, p. 16. The EA also indicates that the Project would reduce the number of large trees, with diameters over 20 inched at breast-height (DBH 20+) by 5%, and would reduce the number of trees with DBH 15-19.9 by 9-13%. *Id*. at 18-19.

151.    The Forest Service contends there will be no harvest in verified old growth. The basis for this conclusion is unidentified, and it appears the Project will allow harvesting of *unverified* old growth. The Forest Service' failure to support its old growth findings violates NFMA and NEPA.

152.    In adopting the Project, the Forest Service did not provide any reasoned explanation or scientific support in response to opposing views raised by the public, but instead, the agency relied on unexplained conclusions to justify its adoption of the Project.

153.    The EA contains no substantive analysis of potential cumulative effects nor is substantive data identified. Green Horse EA, pp. 21-22.

154.    The NEPA analysis for the Green Horse Project included a Grizzly Bear BA that

was issued in September 2022. This document acknowledges that the Green Horse Project will overlap a sub-watershed where grizzly bears "may be present," as determined by FWS from documented sightings. However, the Forest Service nevertheless issued a determination that the project would have "no effect" on grizzly bears.

155.    Although the Grizzly Bear BA purports to show that the project will have no *permanent* impacts on secure habitat, it provides no detailed analysis to support this claim and generally disregards temporary impacts, which may last several years. The BA also provides no detailed analysis of habitat impacts caused by improving or opening 47.3 miles of roads. The BA did not consider project impacts to road density, grizzly bear habitat connectivity, or grizzly bear recovery efforts.

156.    The BA and EA also failed to provide an adequate discussion of cumulative effects on grizzly bears or grizzly bear habitat, habitat connectivity, and recovery caused by several related projects that were not identified or quantitatively evaluated. The Forest Service's impact analyses also failed to examine combined effects of multiple ongoing projects affecting the same wildlife population.

157.    The EA also notes that the project will reduce habitat for fisher, an old growth dependent species by 311 acres, including 268 acres of mature habitat that would take 40 years to recover. Green Horse EA, pp. 34-36. The EA concluded without detailed analysis that this would have no impact on species viability.

158.    The EA analysis of cumulative effects on the fisher noted that the Red Moose Divide Salvage would also reduce fisher habitat by 448 acres, and claimed that 180 acres cut in the 1980s was approaching mature habitat condition. The cumulative effects analysis did not identify or consider the impacts of other ongoing projects and planned projects in nearby and

adjacent areas.

**Limber Elk Project**

159.    In December 2023, the Forest Service issued a Decision Memo to adopt the

Limber Elk Project. The agency authorized the Project under the Healthy Forests Restoration

Act (16 U.S.C. § 6591b).

160.    The Project area consists of 40,792-acres. Through the Project, the Forest Service

will conduct post-harvest, natural and activity fuel treatments on approximately 2,657 acres.

Additionally, the agency will conduct associated road activities, including temporary road

construction and maintenance to facilitate timber harvest.

161.    The Project will result in 14 forest openings greater than 40 acres (ranging from

42 to 173 acres). Decision Memo at p.5. In so doing, the agency violated NFMA because the

1987 Forest Plan contains no standards or components that allow the 40-acre limit to be

exceeded – a necessary requirement before any project can exceed 40 acres. *See Native*

*Ecosystems Council*, 418 F.3d at 961; 36 C.F.R. § 219.11(d); 16 U.S.C. § 1604(g)(3)(F)(iv).

162.    To qualify for a categorical exclusion under the Health Forests Restoration Act,

the "project … may not exceed 3000 acres." 16 U.S.C. § 6591b(c)(1); *see also Wild Watershed*

*v. Hurlocker*, 393 F. Supp. 3d 1086, 1095 (D.N.M. 2019) (a potential treatment project cannot be

excluded from NEPA review unless the "treatment project area" is 3000 acres or less). Here, the

Project area exceeds 3000 acres. Even the acres directly treated are not limited to 3000 acres

because the Decision Memo notes the exact acres to be treated are "approximate and will be

refined based on the field conditions." Decision Memo, p. 4 n.1.

163.    The Decision Memo states that the Project is in compliance with the old growth

standards for the 1987 Forest Plan, and after harvest, the project will meet standards in each

OGAA. However, the Forest Service did not state that no harvest or treatment will occur in old

growth or potential old growth stands. In fact, some of the authorized treatments and road construction will be conducted either in or immediately adjacent to verified old growth stands.

164.    In addressing old growth impacts, the Forest Service improperly relied upon FIA data. This data was not designed to inventory old growth and does not constitute the best available science for assessing old growth. The plot locations also have not been shared with the public or local forest managers, which violates the Forest Plan and prevents independent verification.

165.    The Limber Elk project analysis included a Biological Assessment for Terrestrial Wildlife Species issued on March 24, 2022. This document acknowledges that parts of the Limber Elk Project are located within two sub-watersheds where grizzly bears may be present. Limber Elk BA, p. 7-8. The BA did not evaluate the project's potential impacts to grizzly bear habitat, road density, habitat connectivity, or grizzly bear recovery, and did not consider cumulative effects from other ongoing or planned projects in the area. *Id*. at 8.

166.    The Forest Service's analysis of the project also failed to include an adequate analysis of potential impacts to old-growth-dependent species. For example, with respect to fisher, the Wildlife Specialist's Report indicates that "an increase in open areas above 5% decreases the probability of occupancy in all three sub-watersheds," but provides no quantitative estimate of these openings and fails to specify the area used for the effects analysis. The report also notes that its cumulative effects analysis disregarded the Green Horse and Red Siegel projects even though they are immediately adjacent to the project area, which effectively extends the overall impact area. Wildlife Report, p. 11.

167.    In approving the Project, the Forest Service did not provide any reasoned explanation or scientific support in response to opposing views raised by the public, but instead,

the agency relied on unexplained conclusions to justify its adoption of the Project.

168.    The Forest Service Decision Memo did not consider potential cumulative effects.

**Red Siegel Project**

169.    In June 2023, the Forest Service issued a Decision Memo to adopt the Red Siegel Project. The agency authorized the Project under the Healthy Forests Restoration Act (16 U.S.C. § 6591b).

170.    The Red Siegel Project area encompasses approximately 47,000 acres. The Project authorizes vegetative treatments on over 2,700 acres. Additionally, the Forest Service will conduct associated road activities, including road construction and maintenance to facilitate timber harvest.

171.    In the Decision Memo, the Forest Service stated the Project would result in 24 forest openings greater than 40 acres (ranging from 40 to 227 acres and impacting over 1,800 acres). In so doing, the agency violated NFMA because the 60 day notice only requested that the Project be authorized to create 20 forest openings greater than 40 acres (rather than the 24 forest openings actually adopted through the Project's Decision Memo), and the 1987 Forest Plan contains no standards or components that allow the 40-acre limit to be exceeded – a necessary requirement before any project can exceed 40 acres. *See Native Ecosystems Council*, 418 F.3d at 961; 36 C.F.R. § 219.11(d); 16 U.S.C. § 1604(g)(3)(F)(iv).

172.    For a categorical exclusion under the Health Forests Restoration Act, the "project … may not exceed 3000 acres." 16 U.S.C. § 6591b(c)(1); *see also Wild Watershed*, 393 F. Supp. 3d at 1095. Here, the Project area exceeds 3000 acres. Even the acres directly treated are not limited to 3000 acres because the Decision Memo notes the exact acres to be treated are "approximate and may change upon layout." Decision Memo, p. 3.

173.    The Decision Memo contains no mention of old growth, and the Project file does

not establish old growth will be spared vegetative treatments.

174.    The Decision Memo does not address the Project's conformity to the 1987 Forest Plan, and the Project file does not otherwise demonstrate conformity.

175.    The Forest Service acknowledges that "[s]ome of the most important tasks connected with proper management of the National Forests are the: 1.  Examination of forest stands; 2.  Diagnosis of treatment needs; [and] 3.  Prescription of methods, techniques, and timing of silvicultural activities." FSH 2409.17 - Silvicultural Practices Handbook, p. 3.

176.    In addressing old growth impacts, the Forest Service improperly relied upon FIA data. This data was not designed to inventory old growth and does not constitute the best available science for assessing old growth. The plot locations also have not been shared with the public or local forest managers, which violates the Forest Plan and prevents independent verification.

177.    This examination, diagnosis, and prescription is conducted by a silviculturist: The silvicultural examination collects and records site and stand characteristics needed to identify existing stand conditions, capabilities, and trends. …Stand diagnosis will take place after the silvicultural examination.  The diagnosis considers and evaluates the site capability, management direction, and landscape context relative to desired stand conditions. …A detailed prescription is a written document prepared or reviewed by a certified silviculturist that describes management activities needed to implement a silvicultural treatment or treatment sequence.  The prescription documents the results of an analysis of present and anticipated site conditions and management direction.  It also describes the desired future vegetation conditions in measurable terms as developed during stand diagnosis.  The desired condition is a basis for treatment, monitoring, and evaluation. *Id.* at 3-4.

178.    The public commented that no site-specific silvicultural review had occurred for the Project area. In response, the agency stated: Stand level silvicultural diagnosis and prescriptions will be written and signed by a certified Silviculturist before any proposed vegetation manipulation occurs as part of the proposed action for the Red Siegel project. Nez Perce Forest Plan Consistency for the Red Siegel Project (June 2023), p. 11.

179.    Such deferred analysis goes against NEPA's core purpose to determine potential environmental impacts *before* project approval. *See Tillett v. BLM*, No. CV 16-148-BLG-SPW-TJC, 2017 U.S. Dist. LEXIS 213398, *27-32 (D. Mont. Dec. 5, 2017); *Idaho Conservation League v. U.S. Forest Service*, 2016 U.S. Dist. LEXIS 90371, 2016 WL 3814021, *8-10 (D. Idaho 2016); *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1084 (9th Cir. 2011).

180.    The Forest Service prepared a Wildlife Report and Biological Evaluation (Red Siegel Wildlife Report) in support of the Red Siegel Project, dated May 24, 2023, which states that it serves as the biological assessment for grizzly bear. According to this report:

> The Nez Perce Forest Plan Goal 4 states: "Provide habitat to contribute to the recovery of Threatened and Endangered plant and animal species in accordance with approved recovery plans. Provide habitat to ensure the viability of those species identified as sensitive." Forest Plan objective for grizzly bear states "In compliance with assigned objectives in the Grizzly Bear Recovery Plan, the present status of the grizzly bear will continue to be monitored and updated. Habitat within the Selway-Bitterroot Grizzly Bear Evaluation Area will be inventoried and evaluated to determine its capability to support viable grizzly bear populations. Established protective actions will be exercised in accordance with current federal and state regulations."

Red Siegel Wildlife Report, p. 47-48.

181.    The Red Siegel Wildlife Report acknowledged that bears had been sighted in nearby areas and found that the project would disrupt forage opportunities for 2-3 years and reduce hiding cover for 5-10 years over approximately 3000 acres of habitat. *Id.* at 53. It also

acknowledged that the project would lead to increased human activity from logging, road construction, and increased recreation access, further disturbing available habitat. *Id*. The project's road construction and maintenance activities affecting 130 miles of forest roads would also decrease secure habitat by about 908 acres, or approximately 12% of habitat within the Upper Red River sub-watershed (or HUC). *Id*. at 54. However, the Report nevertheless concluded that the project would have "no effect" on grizzly bears.

182.    The Red Siegel Wildlife Report failed to provide an adequate discussion of cumulative effects on grizzly bears or grizzly bear habitat, habitat connectivity, and recovery efforts that would be caused by ongoing and foreseeable projects in nearby areas that were not identified or quantitatively evaluated. The Forest Service's impact analyses also failed to examine combined effects of multiple ongoing projects affecting the same wildlife populations.

183.    With respect to old-growth-dependent species, the Red Siegel Project would impact 2157 acres of suitable fisher habitat and reduce mature forest habitat by 1845 acres, or about 4%, within the affected sub-watersheds. Red Siegel Wildlife Report, pp. 78-79, 81-82, 89. The Forest Service concluded that, although this "may impact fishers or their habitat," it would not cause a loss of species viability. *Id*. at 90. The Wildlife Report similarly found that the project "may impact individual flammulated owls, pygmy nuthatches, white-headed woodpeckers, and fringed myotis or their habitat" but would not "cause a loss of viability to the population or species." *Id*. at 75-76. The analysis did not consider cumulative impacts caused by additional ongoing and foreseeable projects in nearby areas that would also impact these species and their habitat.

184.    In approving the Project, the Forest Service did not provide any reasoned explanation or scientific support in response to opposing views raised by the public, but instead,

44

the agency relied on unexplained conclusions to justify its adoption of the Project.

185.    The Forest Service Decision Memo did not consider potential cumulative effects.

**Twentymile Project**

186.    In June 2024, the Forest Service issued a Final EA and FONSI for the Twentymile Project. The Decision Notice adopting the Project was signed on June 20, 2024.

187.    The Project has been approved pursuant to an emergency situation determination issued under Section 40807 of the Infrastructure Investment and Jobs Act (16 U.S.C. § 6592c). The Forest Service states the Project lies within two high risk fire-sheds (Calendar and Asbestos Point). The stated reason for requesting this emergency authority was to reduce hazardous wildfire fuels in critical fire-sheds and improve forest health and resiliency in the project area. The Project's approval pursuant to the Infrastructure Investment and Jobs Act means it is not subject to pre-decisional administrative review and has been provided specific limitations for judicial review of requests for injunctive relief.

188.    The Twentymile Project area encompasses approximately 15,000 acres.

189.    The Project authorizes the following vegetative treatments: regeneration harvest on approximately 1,319 acres, intermediate harvest on approximately 858 acres, landscape prescribed burning on approximately 6,807 acres, post-harvest activity fuels treatment within unit consisting of approximately 2,177 acres total, pile burning or broadcast burning activity fuels on approximately 1,493 acres, prescribed burn overlapping harvest units on approximately 684 acres. Additionally, the Forest Service will conduct associated road activities, including road construction and maintenance to facilitate timber harvest.

190.    The Project authorizes forest openings greater than 40 acres in size – with one opening being more than 600 acres in size. In so doing, the agency violated NFMA because the 1987 Forest Plan contains no standards or components that allow the 40-acre limit to be

exceeded – a necessary requirement before any project can exceed 40 acres. *See Native Ecosystems Council*, 418 F.3d at 961; 36 C.F.R. § 219.11(d); 16 U.S.C. § 1604(g)(3)(F)(iv).

191.    Prescribed burning will take place in approximately 408 acres of MA 20, approximately 574 acres of Forest Plan Old growth (FPOG) and approximately 1,182 acres of Replacement Old growth (ROG). Also, some existing FPOG and ROG will be subject to intermediate harvesting.

192.    The Forest Service claims that the minimum requirements for old growth protection outlined in the 1987 Forest Plan will be maintained in the Project area, but this claim is not supported by appropriate quantitative analysis.

193.    The Forest Service's claim that, forest-wide, 10% of total forested acres are old growth that will not be impacted by the Project improperly relied upon FIA data that was not designed to inventory old growth and does not constitute the best available science for assessing old growth. The plot locations also have not been shared with the public or local forest managers, which violates the Forest Plan and prevents independent verification.

194.    In adopting the Project, the Forest Service did not provide any reasoned explanation or scientific support in response to opposing views raised by the public, but instead, the agency relied on unexplained conclusions to justify its adoption of the Project.

195.    The Forest Service noted that timber harvest and fire suppression are projects with potential cumulative effects; however, the agency provided no quantified or detailed information on these projects and effects.

196.    The Forest Service's EA for the Twentymile Project concludes without analysis that the project will have "No Effect" on grizzly bears. Twentymile EA at 41. The EA did not evaluate the project activities for impacts to grizzly bear habitat security, road density, habitat

connectivity corridors, or recovery efforts, and provided no analysis of cumulative effects on grizzly bears. The Decision Notice and the FONSI did not even mention grizzly bears or grizzly bear habitat.

197. With respect to old-growth-dependent species, the Project would "remove approximately 1,118 acres (8.5%) of modeled fisher habitat," while "intermediate harvest" would impact "approximately 390 acres of modeled fisher habitat," and prescribed burning "would impact approximately 6,360 acres of modeled fisher habitat." Twentymile EA at 45. However, the EA concluded that although the Twentymile project "May Impact Individuals or Habitat," it is not likely to result in a loss of fisher viability. *Id*. at 46.

198. The EA's cumulative effects analysis did not identify or quantify cumulative impacts caused by additional ongoing and foreseeable projects in nearby areas that would also impact fisher and other old-growth-dependent species.

**D.    Prior Litigation: End of the World and Hungry Ridge Projects**

199. In 2022, Friends of the Clearwater challenged two projects, the End of the World project and the Hungry Ridge project, arguing, in pertinent part, that these projects failed to comply with the old growth requirements of Appendix N. *See Friends of the Clearwater v. Probert*, Case No. 3:21-cv-189-CWD, 2022 U.S. Dist. LEXIS 113538 (D. Idaho 2022).

200. The End of the World and Hungry Ridge Projects involved logging more than 26,000 acres (over 40 square miles) over a period of ten years. Of that, 7,144 acres (over 11 square miles) of forest would by logged by "regeneration harvest," commonly known as clearcutting and similar practices, and would include 41 openings exceeding the 40-acre standard limit.

201. In its Memorandum Decision and Order (June 24, 2022), the Court found that the Forest Service had violated the NFMA by improperly interpreting NIOG to meet the Forest

Plan's criteria for identifying old growth, as set forth in Appendix N. The Forest Service's decision to count FPOG and NIOG together to satisfy the old growth minimum was "plainly erroneous and inconsistent with the Forest Plan." ECF 48, *Friends of the Clearwater v. Probert*, at *18-19. In addition, the Court found that the Forest Service also failed to comply with the requirements of Appendix N, by failing to provide evidence that it had verified the stand conditions and make-up of MA20 stands. *Id*. at 20-21.

202.    The Court also found that the Forest Service violated NEPA, both because the violations of the NMFA established violations of the NEPA "hard look" requirements, *id*. at 48-49, and because the Forest Service failed to provide an adequate analysis of the projects' cumulative effects on old growth, which was necessary to address the Forest Plan requirement to maintain a minimum of 10% of the total forested acres as old growth. *Id*. at 53. As a result of this inadequacy, the Forest Service improperly determined that that the End of the World Project would have "no significant impact." *Id*. at 59.

203.    The 2022 complaint also alleged that the Forest Service improperly determined that the projects would have *no effect* on threatened grizzly bears, in violation of the NEPA, and also violated Section 7 of the ESA by failing to consult with FWS to ensure that the actions would not adversely impact grizzly bears.

204.    With respect to the ESA claims, while the Court held that the Forest Service had adequately supported its *no effect* finding for the two projects, it did not address Friends of the Clearwater's additional claims that "the Forest Service: 1) did not consider the increase in road density and other short term impacts to grizzly bears; 2) ignored the risk of human/grizzly conflicts based upon the number of workers required to complete the projects over the course of thirteen years; and, (3) did not address the disturbance impacts to grizzly bears from light, noise,

and vehicles." *Id*. at 66 n. 24. This decision also predated the new information published by FWS in its updated 2024 Grizzly Bear SSA and January 2025 Revised Grizzly Bear, Section 4(d) proposed rule, as well as the June 2023 Biological Assessment finding that "the Revised Forest Plan under the Proposed Action May affect and is Likely to Adversely Affect grizzly bears that may currently be present or that may disperse into the plan area in the future." NPCNF (June 2023), p. 381.

205.    Pursuant to the 2022 decision, the Forest Service prepared a supplemental EIS and a new ROD for the Hungry Ridge Project, which was issued on December 23, 2024, and issued an EIS for the End of the World Project on January 6, 2025.

206.    In a subsequent Memorandum Decision and Order lifting injunction (March 26, 2025), the Court clarified that its injunction had not required the Forest Service to consider all six old growth factors included in Appendix N and indicated that this issue could be challenged in a new lawsuit. *See* ECF 82, Memorandum Decision and Order (March 26, 2025) at *21, *24.

207.    The revised End of the World and Hungry Ridge Projects will impact old growth, old-growth-dependent species, and grizzly bear habitat concurrently with the other Six Projects here at issue.

208.    The Forest Service did not consider the cumulative effects of the Six Projects on old growth, old-growth-dependent species, and grizzly bear habitat – including secure habitat, road density, habitat connectivity, and recovery efforts – in its analysis of the End of the World and Hungry Ridge Projects. Nor did it consider these same cumulative effects of the End of the World and Hungry Ridge Projects in its analyses of the Six Projects.

WHEREFORE Plaintiff brings the following claims for relief:

## FIRST CLAIM FOR RELIEF
### NFMA and APA Violations – Six Projects

209.    Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

210.    This claim alleges that Defendants violated the National Forest Management Act, 16 U.S.C. §§ 1601 *et seq.*, and NFMA's implementing regulations, by failing to comply with NFMA regulations and the Nez Perce Forest Plan when it authorized the Six Projects described herein. This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

211.    Pursuant to the NFMA and its implementing regulations, all management actions approved by the Forest Service must be consistent with the governing forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e).

212.    The Forest Service's approval of the Six Projects is inconsistent with the Forest Plan and thus in violation of NFMA by, among other issues noted herein:

(a)    Failing to comply with the requirements of Appendix N in identifying old growth within each of the Six Projects' areas;

(b)    Failing to comply with the requirements of Appendix N in evaluating each of the Six projects' impacts on old growth;

(c)    Failing to maintain at least five percent of the forested acres in every Old Growth Analysis Area at the project site as "existing" old growth forest;

(d)    Failing to designate at least five percent of the forested acres in each Old Growth Analysis Area at the project site as "replacement" old growth; and/or

(e)    Failing to maintain at least ten percent of the forested acres across the Nez Perce National Forest as old growth.

50

213.    The Forest Service also failed to comply with the Appendix N requirement to identify old growth stands through the use of stand exam information, aerial photos, and field reconnaissance.

214.    The Forest Service further violated the NFMA by improperly approving regenerative logging, clearcuts, and/or other vegetation treatments that would cause forest openings of greater than 40-acres in each of the Six Projects' areas.

215.    Plaintiff, having raised these issues in the public comments and, where applicable, administrative objections it submitted for each of the Six Projects, has exhausted its available administrative remedies and has no other remedy.

216.    The Forest Service's approvals of the Six Sales are thus arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must therefore be held unlawful and set aside under 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF
**NEPA and APA Violations – Inadequate analysis; failure to take "hard look"**

217.    Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

218.    This claim alleges that Defendants' approvals of the Six Projects violated NEPA, 42 U.S.C. §§ 4321 et seq., because Defendants failed to take a "hard look" at the Six Projects' potential impacts, as required by NEPA. Plaintiff brings this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

219.    NEPA "requires that federal agencies perform environmental analysis before taking any 'major Federal actions significantly affecting the quality of the human environment.'"

51

*Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013) (quoting 42 U.S.C. § 4332(2)(C)). This requires agencies to take a "hard look" at the environmental effects of their planned actions. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989).

220.    Because the Forest Service's approvals of the Six Projects failed to comply with the NFMA, due to its failure to comply the Forest Plan's Appendix N requirements concerning old growth, those approvals also violate NEPA's "hard look" requirement because the analysis of old growth was inadequate to identify and evaluate the Projects' potential impacts.

221.    In addition, the Forest Service also violated NEPA's "hard look" requirement in approving the Six Projects because it failed to provide an adequate analysis of each Projects' cumulative impacts to forest-wide old growth, as consistent with the Forest Plan requirements set forth in Appendix N.

222.    Further, the Forest Service also violated NEPA's "hard look" requirement in approving the Six Projects without providing an adequate analysis of each Projects' cumulative or combined impacts on grizzly bear recovery, including impacts on secure habitat, road density, habitat connectivity corridors impacting the contiguous recovery area defined by the FWS in 2000, and by failing to consider new information provided in the FWS's 2024 Species Status Assessment finding that grizzly bear recovery within the Bitterroot Ecosystem is critical to the recovery of the lower-48 grizzly bear population DPS.

223.    Plaintiff, having raised these issues in the public comments it submitted for each of the Six Projects and/or in its 60-day Notice letter, has exhausted its available administrative remedies and has no other remedy.

224.    The Forest Service's approvals of the Six Sales are thus arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by

law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must therefore be held unlawful and set aside under 5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF
**NEPA and APA Violations – Failure to Prepare EIS**

225.    Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

226.    This claim alleges that Defendants violated NEPA, 42 U.S.C. §§ 4321 et seq., by authorizing the Dixie-Comstock Community Protection Project, the Green Horse Project, the Limber Elk Project, the Red Siegel Project, and the Twentymile Project without preparing EIRs to evaluate environmental impacts.

227.    Pursuant to NEPA, an agency can analyze effects in three ways: (1) it can prepare an Environmental Impact Statement (EIS); (2) it can prepare an Environmental Assessment (EA); or (3) it can invoke a Categorical Exclusion (CE) to avoid preparing an EIS or EA. 42 U.S.C. 4336(b).

228.    An agency must prepare an EIS if the proposed project will "significantly affect" the environment. 42 U.S.C. § 4332(2)(C). An agency may prepare an EA to determine whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS.

229.    An EIS must be prepared if "substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting *Idaho Sporting Congress v. Thomas*, 137 F.3d 137 F.3d 1146, 1149 (9th Cir. 1998) (internal quotation omitted).

230.    If an agency decides not to prepare an EIS, it must supply a "convincing statement of reasons" to explain why a project's impacts are insignificant. *Save the Yaak Committee v. Block*, 840 F.2d 714, 717 (9th Cir. 1988). "The statement of reasons is crucial to determining whether the agency took a "hard look" at the potential environmental impact of a project." *Id*. Taking a "hard look" includes "considering all foreseeable direct and indirect impacts." *Center for Biological Diversity v. Salazar*, 695 F.3d 893, 916-17 (9th Cir. 2012).

231.    Here, Defendants violated NEPA by improperly approving CE's and emergency exemptions, and by failing to demonstrate that each CE or emergency exemption was properly applied, and/or failing to demonstrate that each Project will not have a significant effect on the environment.

232.    Plaintiff, having raised these issues in the public comments it submitted for each of these Projects, has exhausted its available administrative remedies and has no other remedy.

233.    Because the Forest Service approval these five Projects was improperly based on CEs and emergency exemptions, these actions were arbitrary and capricious, abuses of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must therefore be held unlawful and set aside under 5 U.S.C. § 706(2).

## FOURTH CLAIM FOR RELIEF
### NFMA and APA Violations – End of the World and Hungry Ridge

234.    Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

235.    This claim alleges Defendants violated the NFMA and its implementing regulations by failing to comply with the Nez Perce Forest Plan when they re-authorized the End

of the World Project and the Hungry Ridge Project. This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

236.    Pursuant to the NFMA and its implementing regulations, all management actions approved by the Forest Service must be consistent with the governing forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e).

237.    The Forest Service's new approvals of the End of the World Project and Hungry Ridge Project are inconsistent with the Forest Plan and therefore violate the NFMA because they failed to comply with the requirements of Appendix N in identifying old growth and evaluating the projects' impacts on old growth within each of the projects' areas.

238.    In particular, the Forest Service's analysis of old growth fails to consider all six criteria for old growth, as set forth in Appendix N, and identifies stands as "old growth" based on only two of six criteria.

239.    As a result of this deficient analysis, the Forest Service fails to establish that the Projects will maintain (i) at least five percent of the forested acres in every Old Growth Analysis Area at the projects sites as "existing" old growth forest, and (ii) at least ten percent of the forested acres across the Nez Perce National Forest as old growth.

240.    Plaintiff, having raised this issue in public comments and in prior litigation that did not reach a ruling on this issue, has exhausted administrative remedies and has no other remedy at law.

241.    The Forest Service's approvals of the End of the World and Hungry Ridge Projects are thus arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and

must be held unlawful set aside under 5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF
### NEPA and APA Violations – Improper "No Effect" Findings
### Six Projects

242.    Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

243.    This claim challenges Defendants' determinations that each of the Six Projects would have "no effect" on grizzly bears and grizzly bear habitat.

244.    Pursuant to Section 7(a)(2) of the ESA, federal agencies must consult with the FWS to "insure" that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any listed species or destroy or adversely modify its designated critical habitat. 16 U.S.C. § 1536(a)(2). To comply with Section 7(a)(2), federal agencies must consult over any agency action that "may affect" an ESA-listed species. 16 U.S.C. § 1536; 50 C.F.R. § 402.14(a).

245.    The threshold of "may affect" is low and includes any possible effect. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). "Any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." *Ctr. for Biological Diversity v. United States BLM*, 698 F.3d 1101, 1122 (9th Cir. 2012).

246.    Here, the Six Projects will disturb grizzly habitat with the noise and activity of logging and road building, causing loss of cover and secure habitat, increased road density, increased human presence, and increased risk of human-bear conflicts during years of logging and follow-up work in an area where the FWS has approved and documented the need for grizzly bear recovery, and recognizes grizzly bears may be present, and where one or more grizzly has been documented recently, exceeds the "may affect" threshold.

247.    The combined effects of the Six Projects, together with Hungry Ridge and End of the World projects, is also environmentally significant, as bears seeking to avoid one project will face a gauntlet of additional disturbances posed by the full array of ongoing projects.

248.    Defendants' "no effect" determinations concerning the Six Projects' potential impacts on grizzly bears are not supported by current science and new information, and fail to address impacts on grizzly bear habitat and recovery – including impacts on habitat security, road density, habitat connectivity corridors – as well as the combined impacts of the Six Projects and the End of the World and Hungry Ridge Projects on grizzly bear recovery in the Bitterroot ecosystem and in the lower-48 states, contiguous U.S. distinct population segment.

249.    Defendants' "no effect" determinations are, thus, arbitrary and capricious, abused lawful discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA. Thus, each of the "no effect" determinations must be held unlawful and set aside under 5 U.S.C. § 706(2).

250.    Plaintiff, having raised this issue in public comments, has exhausted administrative remedies and has no other remedy at law.

## SIXTH CLAIM FOR RELIEF
### NEPA and APA Violations – Improper "No Effect" Findings
### Hungry Ridge and End of the World Projects

251.    Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

252.    This claim challenges Defendants' determinations that the Hungry Ridge and End of the World projects would have "no effect" on grizzly bears and grizzly bear habitat.

253.    Defendants' analyses of the Hungry Ridge and End of the World projects failed to consider impacts to road density, habitat security, grizzly bear habitat connectivity, and grizzly

bear recovery in areas in and near places where grizzly bears may be present and areas critical to grizzly bear recovery.

254.     In prior litigation challenging Defendants' approvals of the Hungry Ridge and End of the World projects, the Court did not reach the questions of whether the projects may affect grizzly bears by causing (1) increased road density, (2) increased risk of human/grizzly conflicts over the life of the project, and (3) impacts to grizzly bears from light, noise, and vehicles.

255.     Defendants also failed to consider impacts to road density, habitat security, grizzly bear habitat connectivity, and grizzly bear recovery in its approval of the revised Hungry Ridge and End of the World projects – including the combined impacts of these projects and the Six Projects and the on grizzly bear recovery in the Bitterroot ecosystem and in the lower-48 states, contiguous U.S. distinct population segment.

256.     The combined effects of the Hungry Ridge and End of the World projects, together with the effects of the Six Projects, is also environmentally significant, as bears seeking to avoid one project will face a gauntlet of additional disturbances posed by the full array of ongoing projects.

257.     Defendants' "no effect" determinations are, thus, arbitrary and capricious, abused lawful discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA and must be held unlawful and set aside under 5 U.S.C. § 706(2).

258.     Plaintiff, having raised this issue in public comments and in prior litigation that did not reach a ruling on this issue, has exhausted administrative remedies and has no other

remedy at law.

### SEVENTH CLAIM FOR RELIEF
### ESA § 7 – Failure to Consult
### Six Projects

259.    Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

260.    This claim alleges that Defendants violated Section 7(a)(2) of the ESA by failing to consult with the FWS concerning the impact of the Six Projects on grizzly bears and grizzly bear habitat and recovery needs. Plaintiff brings this claim pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A).

261.    Section 7(a)(2) of the ESA requires federal agencies to consult with the FWS to "insure" that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any listed species or destroy or adversely modify its designated critical habitat. 16 U.S.C. § 1536(a)(2).

262.    To comply with Section 7(a)(2), federal agencies must consult over any agency action that "may affect" an ESA-listed species. 16 U.S.C. § 1536; 50 C.F.R. § 402.14(a).

263.    The threshold of "may affect" is low and includes any possible effect. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011).

264.    The Six Projects will disturb grizzly habitat with the noise and activity of logging and road building, causing loss of cover and secure habitat, increased road density, increased human presence, and increased risk of human-bear conflicts during years of logging and follow-up work in an area where the FWS has approved and documented the need for grizzly bear recovery, and recognizes grizzly bears may be present, and where one or more grizzly has been documented recently, exceeds the "may affect" threshold.

59

265.    Because the Six Projects "may effect" grizzly bears, grizzly bear habitat, and grizzly bear recovery, Defendants failed to comply with its duty to consult with FWS.

266.    By failing to engage in ESA Section 7 consultation with FWS concerning the potential effects of the Six Projects with respect to grizzly bears, based on its erroneous determination that the projects would have "no effect" on grizzly bears, the Forest Service is in violation of the ESA and its implementing regulations, and must be enjoined under the ESA, 16 U.SC. § 1540(g)(1)(A).

267.    Plaintiff, having raised this issue in public comments and in its 60-day notice letter, as required by 16 U.S.C. § 1540(g), has exhausted administrative remedies and has no other remedy at law.

**EIGHTH CLAIM FOR RELIEF**
**ESA § 7 – Failure to Consult**
**Hungry Ridge and End of the World Projects**

268.    Plaintiff realleges and incorporates all of the preceding paragraphs as if fully set forth herein.

269.    This claim alleges that Defendants violated Section 7(a)(2) of the ESA by failing to consult with the FWS concerning the impact of the Hungry Ridge and End of the World projects on grizzly bears and grizzly bear habitat and recovery needs. Plaintiff brings this claim pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A).

270.    The Hungry Ridge and End of the World projects, individually and collectively, will disturb grizzly habitat with the noise and activity of logging and road building, causing loss of cover and secure habitat, increased road density, increased human presence, and increased risk of human-bear conflicts during years of logging and follow-up work in an area where the FWS has approved and documented the need for grizzly bear recovery, and recognizes grizzly bears may be present, and where one or more grizzly has been documented recently, exceeds the "may

60

affect" threshold.

271.    Because the Hungry Ridge and End of the World projects "may effect" grizzly bears, grizzly bear habitat, and grizzly bear recovery, Defendants failed to comply with its duty to consult with FWS.

272.    By failing to engage in ESA Section 7 consultation with FWS concerning the potential effects of the revised Hungry Ridge and End of the World projects with respect to grizzly bears, based on its erroneous determination that the projects would have "no effect" on grizzly bears, Defendants are in violation of the ESA and its implementing regulations, and must be enjoined under the ESA, 16 U.SC. § 1540(g)(1)(A).

273.    Plaintiff, having raised this issue in public comments and in its 60-day notice letters, as required by 16 U.S.C. § 1540(g), and in prior litigation that did not fully examine this issue, has exhausted administrative remedies and has no other remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Issue an order and injunction compelling Defendants to cease implementation of the Six Projects and End of the World Project and the Hungry Ridge Project until Defendants have complied with NEPA and the NFMA;

B.    Vacate and set aside the decisions approving Six Projects and End of the World Project and the Hungry Ridge Project;

C.    Maintain jurisdiction over this action until Defendants are in compliance with NEPA and the NFMA and every order of this Court;

D.    Grant such additional and further relief to which Plaintiffs may be entitled or as the Court may deem necessary, just or proper;

E.    Award Plaintiffs attorney fees and costs pursuant to 16 U.S.C. § 1540(g) and/or

28 U.S.C. § 2412.

Dated: October 3, 2025                              ERTZ LAW, PLLC
=


                                                    */s/ Brian A. Ertz*
                                                    Brian A. Ertz

                                                    *Attorneys for Plaintiff*